## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| R.R., *a Minor, By and through her Mother and Next of Friend Christie Rogers*, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 2:17-cv-00751-TMP |
| DAVID EATON, | ) ) | |
| Defendants. | ) | |

## <u>MEMORDANDUM OPINION</u>

This cause is before the court on the motion for summary judgment filed September 27, 2018, by the sole defendant, David Eaton ("Defendant" or "Eaton"). (Doc. 44). Defendant seeks dismissal of all R.R.'s ("Plaintiff") claims arising from the search of her grandmother's home, where she was then living, on May 9, 2015, when Eaton and Deputy Dill ("Dill") entered the home to serve an arrest warrant on R.R.'s sister, Breana Clayton. (Doc.44). The motion has been fully briefed. The parties consented to dispositive jurisdiction by a magistrate judge on September 28, 2016. (Doc. 14). Accordingly, the court enters the following Memorandum Opinion.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 47 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met its burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting former Fed. R.

Civ. P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court "shall" grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The substantive law will identify which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 246.  His guide is the same standard necessary to direct a verdict:  "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n. 11 (1983).

However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The evidence supporting a claim must be "substantial," Marcus v. St. Paul Fire and Marine Ins. Co., 651 F.2d 379 (5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a genuine issue of fact. Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-50 (11th Cir. 2004). If the non-movant's evidence is so thoroughly discredited by the rest of the record evidence that no *reasonable* jury could accept it, the evidence fails to establish the existence of a genuine issue of fact requiring a jury determination. See Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have reviewed the facts in the light depicted by the videotape."); Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1290 n. 3 (11th Cir. 2009). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence

on which the jury could reasonably find for the plaintiff.  <u>Anderson</u>, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  <u>Brown v. City of Clewiston</u>, 848 F.2d 1534, 1540 n. 12 (11th Cir. 1988).

## SUMMARY JUDGMENT FACTS

For the purposes of summary judgment the court construes all facts in favor of the nonmovant, in this case the plaintiff. The following facts, so construed, are relevant for the purposes of summary judgment.

Eaton is a deputy sheriff with the Jefferson County Sheriff's Office ("JCSO") in Alabama.  On May 9, 2015, Eaton was assigned to the "Birmingham Division," which is one of two divisions within the JCSO that is tasked with serving arrest warrants.  On that date, the JCSO was conducting a "Saturday roundup," an operation in which the department seeks to serve arrest warrants based on a determination that people are more likely to be home on Saturday mornings than throughout the workweek.  Eaton was assigned to a felony warrant for Breana Clayton.  The address on the warrant was 2116 6th Place West, Birmingham, Alabama. That address is the home of Bettie Clayton, R.R.'s and Breana Clayton's grandmother.  R.R. was living with Bettie Clayton on May 9, 2015, but Breana was not.

The arrest warrant for Breana Clayton had been issued on April 30, 2015, in response to a report taken by the Hueytown Police Department on April 29, 2015, alleging that Breana Clayton had stolen multiple items from a Walmart store. The warrant listed Breana Clayton's address as 2116 6th Place West, though she was not residing with Bettie Clayton at the time. Breana Clayton had not provided that address to the Hueytown police and it is not clear how the address was obtained.[1]

Eaton was first assigned the warrant a few days prior to the Saturday roundup. On May 6, 2015, he searched for Breana's address in the AlaCop database, an online portal that gives law enforcement access to the information contained in all Alabama driver's licenses. Eaton confirmed that the address listed on Breana Clayton's driver's license, issued in May 2011, was the same 2116 6th Place West listed on the warrant. Eaton did not take any further measures to ascertain whether Breana Clayton actually lived in the home. He agrees that he did not conduct surveillance at the address or talk to neighbors to attempt to confirm that Breana resided there. Eaton admits that he often encounters people who do not live at the address on their driver's licenses and that he often arrests people at addresses other than that stated on the arrest warrant.

---

[1] Neither party has presented any evidence to the court that explains or attempts to explain where the Hueytown Police Department obtained the address that appeared on the warrant, but there is no dispute that Breana did not give that address to the police.

On May 9, 2015, Eaton and another deputy, Dill, went to the residence at 2116 6th Place West to attempt to serve the arrest warrant on Breana. Dill, who normally worked in the county jail, was partnered with Eaton because, during Saturday roundups, the JCSO will use deputies who are normally assigned to the jails to partner with warrant division deputies for safety purposes. Dill had no specialized training or experience in serving arrest warrants. The deputies arrived at the Clayton residence between 9:00 and 9:30 a.m.[2] Outside of the home, there was one vehicle. Eaton did not check the vehicle registration or attempt to ascertain whether the vehicle belonged to Breana Clayton.

At the Clayton residence the front door consisted of an outer security door made of a plexiglass and steel frame, inside of which was a standard wooden door. When Eaton knocked on the front door, Bettie Clayton came to the door and opened the inner wooden door, but left the outer security door closed and locked. Dill had gone to the back of the home to ensure that no one ran out of the house through other doors. Eaton spoke with Bettie Clayton and informed her that he was there to serve an arrest warrant on Breana Clayton. Bettie Clayton informed Eaton that Breana was not in the house, that she did not live there, and that she had

---

[2] The exact time is not known; however, Bettie Clayton called 911 at 9:39 a.m. at which point Eaton was already inside the home.

not lived there for several months. Eaton neither asked Bettie Clayton about a familial relationship with Breana Clayton nor determined that one existed.[3]

While this was occurring, plaintiff R.R., a thirteen-year old middle school student, was in her bedroom at the back of the house. Upon seeing a shadow outside of her bedroom window, R.R. briefly opened the blinds to see who was walking around the house. When she did, Dill saw the "movement" in the window and reported it to Eaton. There is no indication that Dill was able to see anything but "movement" in the window. He was not able even to say that a person caused the movement, or to see anyone that looked like Breana. Dill reported to Eaton only that he had seen "movement" in the window. Eaton instructed Bettie Clayton to open the security door, but she refused because, as she told him again, Breana Clayton did not live in the home and was not there. Eaton then used a crowbar and a sledgehammer to break open the security door and force entry into the home. At the time, he possessed only the arrest warrant for Breana; there was no search warrant for the home.

Eaton went room to room inside of the home searching for Breana Clayton. Inside the home he encountered R.R., who was still in her pajamas in bed. She was the only other person in the house. He asked her for identification because he

---

[3] Defendant alleges that he did establish that there was a familial relationship between Bettie Clayton and Breana Clayton and that this contributed to his belief that Breana Clayton was inside the house. Bettie Clayton's testimony, however, is that Eaton did not ask and she did not tell him about any family relationship to Breana.

believed she looked like the driver's license photograph he had of Breana Clayton, who was 21 years old at that time. Because of her young age, she had no identification other than her middle school ID card, which she retrieved from a dresser. After he was satisfied that Breana Clayton was not in the home, he left a business card with Bettie Clayton and left the house.

## DISCUSSION

There are only two federal causes of action remaining in the lawsuit. Those claims are denial of due process[4] and unlawful search in violation of the Fourth Amendment asserted pursuant to 42 U.S.C. § 1983. (Doc. 36). Eaton asserts that these remaining claims are appropriate for summary disposition because he is entitled to qualified immunity. (Doc. 44-1, p.10). The plaintiff asserts that Eaton does not have qualified immunity because no reasonable police officer would conclude, under these circumstances, that he had authority to enter the house over the objection of Bettie Clayton, and therefore, the motion should be denied. (Doc. 53, p. 9).

---

[4] While Plaintiff has asserted a generic due process claim, the claim is subsumed within the Fourth Amendment claim and will be analyzed under the Fourth Amendment standard. Where, as here, a constitutional claim arises under a Constitutional provision that affords protection specific to the wrong alleged, the court should analyze the claim under that Constitutional provision, rather than under due process. United States v. Lanier, 520 U.S. 259, 272 n. 7, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997) (reasserting the holding of Graham v. Connor, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)). Thus, the due process claim is not a separate basis for liability.

Under federal law, it is well settled that qualified immunity protects government officials performing discretionary functions from civil suit, and from liability, where their conduct does not violate "clearly established statutory or constitutional rights." Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)). Furthermore, it is the general rule that qualified immunity will protect government actors from liability, and only in "exceptional cases" will the immunity be unavailable as a shield. Harris v. Board of Education of Atlanta, 105 F.3d 591, 595 (11th Cir. 1997). Even so, qualified immunity does not apply in those instances where the case law establishes a "bright line" in such a "concrete and factually defined context" to make it obvious to all reasonable government actors, in the defendant's place, that the actions violate federal law. Scarbrough v. Myles, 245 F.3d 1299, 1301 (11th Cir. 2001). For qualified immunity to be lost, the government actor must have fair warning that his conduct violates the constitutional rights of another.

A summary of qualified immunity in the context federal constitutional claims states:

> Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S.

800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)). …
Qualified immunity from suit is intended to "allow government
officials to carry out their discretionary duties without the fear of
personal liability or harassing litigation, protecting from suit all but
the plainly incompetent or one who is knowingly violating the federal
law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal
quotation marks and citations omitted).

Courts utilize a two-part framework to evaluate qualified immunity
claims. One inquiry in a qualified immunity analysis is whether the
plaintiff's allegations, if true, establish a constitutional violation.
*Hope v. Pelzer*, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513, 153 L. Ed.
2d 666 (2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct.
2151, 2156, 150 L. Ed. 2d 272 (2001)). If the facts, construed as they
must be in this summary judgment appeal in the light most favorable
to the plaintiff, show that a constitutional right has been violated,
another inquiry is whether the right violated was "clearly established."
*Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156. Both elements of this
test must be present for an official to lose qualified immunity, and this
two-pronged analysis may be done in whatever order is deemed most
appropriate for the case. *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct.
808, 821, 172 L.Ed.2d 565 (2009).

Brown v. City of Huntsville, Ala., 608 F.3d 724, 733–34 (11th Cir. 2010).

The defendant claiming qualified immunity must carry an initial burden of

proving that he was engaged in the exercise of discretionary authority. "To obtain

qualified immunity, an official such as a police officer must first show he was

'act[ing] within his discretionary authority.'" Mobley v. Palm Beach County

Sheriff Dep't, 783 F.3d 1347, 1352 (11th Cir. 2015) (quoting Morton v. Kirkwood,

707 F.3d 1276, 1280 (11th Cir. 2013)). In the Fourth Amendment context, the

determination of whether a police officer is entitled to qualified immunity does not

turn on "whether he has the right to engage in unconstitutional searches and seizures, but whether engaging in searches and seizures in general is a part of his job-related powers and responsibilities." <u>Hollman v. Harland</u>, 370 F.3d 1252, 1266 (11th Cir. 2004).

It is undisputed that Eaton was engaged in a discretionary function at the time that he entered the Clayton residence. (Doc. 44-1, p. 12; Doc. 53, p. 10). Therefore, the motion turns on whether R.R. has shown that Eaton is not entitled to qualified immunity. Question one before the court is whether the defendant, David Eaton, violated the plaintiff's Fourth Amendment rights when he used a crowbar and sledgehammer to breech the front door of her home and conduct a room-to-room search of the house looking for the subject of an arrest warrant. If he did, the question becomes whether the right to be free of such a search was so clearly established at the time of the violation that the defendant is not entitled to qualified immunity.

## A.  Violation of the Fourth Amendment

The court finds that the defendant violated R.R.'s Fourth Amendment right to be free of unreasonable search when he entered her grandmother's home where she was living on May 9, 2015. Although the home belonged to her grandmother, it was her residence as well. R.R. possessed a reasonable expectation of privacy in

her home, even though it was owned by her grandmother, and that reasonable expectation was clearly violated by Eaton's entry.

The Fourth Amendment, made applicable to the states by the Fourteenth Amendment, provides, in relevant portion, that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. It is long established that physical entry into a person's home is "the chief evil against which the wording of the Fourth Amendment is directed." U.S. v. U.S. Dist. Court for Eastern Dist. Of Mich., Southern Division, 407 U.S. 297, 313, 92 S. Ct. 2125, 32 L. Ed. 2d 752 (1972). Entering into a home to conduct a search or seizure without a warrant is "presumptively unreasonable" because privacy within one's dwelling is one of the foundational protections guaranteed by the Fourth Amendment. Payton v. New York, 445 U.S. 573, 586-7, 100 S. Ct. 1371, 1378, 63 L. Ed. 2d 639 (1980); see also Kentucky v. King, 563 U.S. 452, 459, 131 S. Ct. 1849, 1856, 179 L. Ed. 2d 865 (2011); Brigham City v. Stuart, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L.Ed.2d 650 (2006); Groh v. Ramirez, 540 U.S. 551, 559, 124 S. Ct. 1284, 157 L.Ed.2d 1068 (2004)). In the colonial period, "indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment." Id. at 583, 100 S. Ct. at 1378. However, "an arrest warrant founded on probable cause

implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Id. at 603. However, an arrest warrant does not carry with it an authorization to search the home of a third party for the subject of the warrant absent an independent showing that the subject of the arrest warrant is located inside the third-party's home. Steagald v. U.S., 451 U.S. 204, 213-4, 101 S. Ct. 1642, 68 L. Ed. 2d 38 (1981). In the Eleventh Circuit, this has been interpreted to require the police to have a "reasonable belief" that the subject of an arrest warrant is inside a home in order to comport with Fourth Amendment protections. United States v. Bervaldi, 226 F.3d 1256, 1263 (11th Cir. 2000).

The determination of whether the police had authorization to enter a dwelling under authority of an arrest warrant is a two-part inquiry. United States v. Magluta, 44 F.3d 1530, 1533 (11th Cir. 1995). "First, there must be a reasonable belief that the location to be searched is the suspect's dwelling, and second, the police must have reason to believe that the suspect is within the dwelling." Id. (internal quotation marks omitted) (finding that the police were privileged to enter a residence because they had a valid arrest warrant if "they had reason to believe it was [the suspect's] residence, and if they had reason to believe that [the suspect] was home at the time of entry.") Though "reasonable belief" has not been completely defined in this context, the court should evaluate the

reasonableness of the belief when "the facts and circumstances within the knowledge of law enforcement agents [is] viewed in the totality." Id. at 1535. Additionally, "courts must be sensitive to common sense factors indicating a resident's presence." United States v. Bervaldi, 226 F.3d 1256, 1263 (11th Cir. 2000).

As noted above this is a two-part inquiry. It is not sufficient that Eaton had either a reasonable belief that the home was Breana Clayton's or a reasonable belief that Breana Clayton was inside the home when he forcibly entered, rather he must have had *both*. For Eaton's forced entry into R.R.'s home to be reasonable under the Fourth Amendment, the evidence, viewed favorably to the plaintiff, must support a reasonable inference that Eaton had "reason to believe" that Breana resided at the home *and* "reason to believe" that she was actually there at the time he entered.

1. Reasonable Belief that the Home was Breana' Clayton's Residence

The defendant argues that he had a reasonable belief that the address was Breana Clayton's residence when that address was the same as appeared on her driver's license and on the arrest warrant. (Doc. 44-1, pg. 15; Doc. 54, pg. 8). However, court finds that this is not enough to pass muster under the precedent in the Eleventh Circuit. Multiple report and unreported cases in the Eleventh Circuit all have emphasized investigative facts beyond mere reliance of a driver's license

address.  For example, in <u>United States v. Bervaldi</u>, 226 F.3d 1256, 1263(11th Cir. 2000), the court noted that the police had a reasonable belief that a house was a suspect's dwelling, despite his driver's license address being *different*, when he was a young person and indicated that the driver's license address was his parent's address).  Also, in <u>United States v. Bellamy</u>, 456 F. App'x 863, 865 (11th Cir. 2012) (unpublished), the court found that officers had a reasonable belief that a residence was the suspect's where local police had stated that it was the suspect's address, the apartment complex confirmed that suspect's girlfriend lived at the address, and the suspect had been seen there before.  In <u>Daker v. Steube</u>, 514 F. App'x 885, 888-9 (11th Cir. 2013) (unpublished), an officer had the requisite reason to believe a residence was the suspect's when the warrant listed that address, the address matched the suspect's driver's license, *and* recent booking records provided that same address).  Likewise,  the Eleventh Circuit found in <u>United States v. Weeks</u>, 442 F. App'x 447, 452 (11th Cir. 2011) (unpublished), that there was a reasonable belief that the suspect lived at the residence when deputy received a tip that suspect lived there, confirmed that address through a utilities database, and the deputy saw the suspect coming and going while conducting surveillance).

None of these additional investigative facts exist in the instant case.  The sole basis for defendant Eaton's belief that Breana resided at the address was the

match between the address on the warrant and the address on Breana's driver's license.  It is clear that the Hueytown police did *not* get the address information on the warrant from Breana.  She was not interviewed by police or arrested by them before the search at R.R.'s home.  There is no evidence that *she* provided the address.  Cf. Payton v. City of Florence, 413 F. App'x 126, 132 (11th Cir. 2011) (residence address was provided by the suspect when he was arrested without a warrant on a charge that later was indicted and on which the warrant was then issued).  From his own experience, Eaton knew that people are often arrested at residences different from that stated on their driver's licenses.  Reliance on a match of the warrant address to a driver's license address *alone* could not be a reasonable basis for concluding that the address was Breana's residence.

The defendant relies heavily upon Payton v. City of Florence to show that reliance on the address on a suspect's driver's license is sufficient to form a reasonable belief that the address is the suspect's residence.  See (Doc. 54, pp. 7-8) (citing Payton v. City of Florence, 413 F. App'x 126, 132 (11th Cir. 2011)).  However, the defendant fails to recognize that the officers in Payton relied on more than a mere match of the warrant address to the driver's license address to form their belief.  In Payton, the officers relied on three different documents, and each document listed the same address that *had been provided by the suspect himself* at the time of his initial booking.  413 F. App'x at 131.

In this case, Eaton relied on a warrant and a driver's license. Presumably, Breana Clayton provided the address on her driver's license.[5] However, Eaton admitted he was unaware of how or where the Hueytown Police had obtained the address they listed on the warrant. Therefore, it was not reasonable for Eaton to view the address on the warrant as reliable proof that Breana Clayton lived at the 6th Place West address. The only reliable evidence that Eaton had that Breana Clayton resided at the 6th Place West address was her driver's license, and it was likely four years old.

Additionally, because the court should look at the totality of the circumstances, it is appropriate for the court to note that the suspect in <u>Payton</u> and Breana Clayton were at different stages of their lives, which affects the reasonableness of the belief that they would reside at the address listed on their driver's licenses. In <u>Payton</u>, the suspect was a 37-year-old man. 413 F. App'x at 132 n. 4. In this case, Breana Clayton was 21 years old. The Eleventh Circuit has recognized that people in their twenties may use a parent or guardian's address on their driver's license because it may be more permanent than their actual residence

---

[5]  Ex. 7 to the Deposition of Joni Money (one of the Rule 30(b)(6) persons designated to testify for the Jefferson County Sheriff's Department) shows the issuance and renewal history of Breana Clayton's driver's license. It was first issued to her on May 4, 2011, four years prior to the search of 2116 6th Place West. "Duplicates" of the license were provided on March 5 and October 23, 2014, each continuing to show the initial address of 2116 6th Place West. The license was then renewed on May 18, 2015, nine days after the search. The renewed license showed a different address than 2116 6th Place West for Breana Clayton. Although not clear, it appears that Breana Clayton provided the 2116 6th Place West address at the time she obtained the license in 2011—four years before the events of May 9, 2015.

address.  See Bervaldi, 226 F.3d at 1263-4. Also, because the license was issued four years earlier, when Breana was 16 or 17 years old, there was a good likelihood that she no longer lived at that address at the age of 21.  Young adults tend to leave their childhood homes between the ages of 16 and 21.  Additionally, Eaton admitted that he served warrants on individuals who lived at addresses other than the one listed on their driver's licenses. (Doc. 44. Ex. 1, p. 119 (10-13)).

The Eleventh Circuit has never held that an officer had a reasonable belief that an address was a suspect's residence when that officer relied solely upon one document. That is especially true when that one document was a 21-year-old woman's driver's license when it is known that people of that age tend to use a parent's or guardian's address on their driver's licenses. Therefore, the court finds that Eaton did not have a reasonable belief that Breana Clayton lived at 2116 6th Place West on May 9, 2015, when he used a crowbar and a sledgehammer to force his way into the home.

2.  Reasonable Belief that Breana Clayton was Inside the Home

Though it is enough for the purposes of establishing a violation of the Fourth Amendment that Eaton did not have a reasonable belief that the 6th Place West address was Breana Clayton's residence, the court also finds that Eaton did not have a reasonable belief that Breana Clayton actually was inside the house when he forcibly entered.  It is true that there is a presumption that a suspect will be inside

her residence at certain times of the day.  See Magluta, 44 F.3d at 1535.  However, like any presumption, this presumption can be rebutted.  Id.  Eaton argues that his belief was reasonable because it was around 9:00 a.m. on a Saturday morning and because his partner, Dill, saw movement in a window.  (Doc. 54, pp. 8-9).

Again the court must look at the totality of the circumstances and must not neglect to consider common sense. The Eleventh Circuit has never held that an officer had a reasonable belief that a suspect was inside a house simply because it was a Saturday morning and an officer detected some unidentified movement in a window.  See United States v. Beck, 729 F.2d 1329, 1331 (11th Cir. 1984) *cert. denied*, 469 U.S. 981, 105 S. Ct. 383, 83 L. Ed. 2d 318 (finding it was reasonable to believe a suspect was inside when the police were not aware of a specific schedule to the contrary, suspect's car was parked close by, and it was 7:30 a.m.); United States v. Magluta, 44 F.3d 1530, 1533 (11th Cir. 1995) *cert. denied*, 516 U.S. 869, 116 S. Ct. 189, 133 L. Ed. 2d 126 (1995) (finding police had a reasonable belief that suspect would be in the home when a frequent visitor was at the residence, a vehicle connected to the suspect was parked outside, the yard and home was up kept and clearly routinely occupied, and there was no evidence that the suspect had left); United States v. Bervaldi, 226 F.3d 1256, 1263(11th Cir. 2000) (finding police had a reasonable belief that the suspect was home when a vehicle connected to the suspect had been seen at the house in the months before

the raid and the police officers entered the house around 6:00 in the morning);

United States v. Bellamy, 456 F. App'x 863, 865 (11th Cir. 2012) (finding that officers had a reasonable belief the suspect was inside the house when a car that was connected to the suspect was located nearby at the time they entered the house); Payton v. City of Florence, 413 F. App'x 126, 132 (11th Cir. 2011) (finding that police officers had a reasonable belief that suspect was inside when it was 7:45 a.m., his mother answered the door, and she provided inconsistent statements about suspect's whereabouts); United States v. Zavala, 408 F. App'x 319, 322 (11th Cir. 2011) (finding that officers held the reasonable belief necessary to comport with the Fourth Amendment where the suspect's car was at the residence, it was early in the morning, and suspect was not at his other suspected residence); Sevostiyanova v. Cobb County of Ga., 484 F. App'x 355, 359 (11th Cir. 2012) (finding that entry into a suspect's home to effectuate an arrest was proper where it was early in the morning, there was no evidence to suggest suspect was not at home, and someone matching suspect's description was seen inside the home); Daker v. Steube, 514 F. App'x 885, 888-9 (11th Cir. 2013) (finding that an officer had a reasonable belief the suspect was inside when he saw someone else inside the home and the person at the door refused to identify the other occupant and was generally uncooperative); United States v. Weeks, 442 F. App'x 447, 452 (11th Cir. 2011) (finding that the police that a reasonable belief suspect was inside

when it was 6:30 a.m., a person was seen in the window, and no one would answer the door after police announced their presence as law enforcement); United States v. Farley, 402 F. App'x 505, 506 (11th Cir. 2010) (finding that a U.S. Marshal's forcible entry into a home was permitted under the Fourth Amendment when he relied on information provided by a historically reliable confidential informant, the confidential informant was able to provide specific details about the suspect, and the Marshal recognized someone through the window who favored the suspect); United States v. Bridgewater, 333 F. App'x 470, 472 (11th Cir. 2009) (finding that officers had a reasonable belief that suspect was inside his home when a car connected to the suspect was parked outside and the officers arrived at the house at 7:00 a.m.). Although the fact that it was Saturday morning adds to the assessment of the reasonableness of Eaton's belief, that fact alone did not make Eaton's belief that Breana was in the house reasonable. If the simple fact that it was Saturday were enough to give Eaton "reason to believe" that Breana was actually in the house, then Saturdays become free days on which officers have the greenlight to enter homes to execute arrest warrants. Saturdays, Sundays, and holidays are not "Fourth Amendment Free" days, when the protection of the Amendment is diminished compared to the other days of the week.

As the above-cited cases demonstrate, something more than the mere day of the week must exist for the officer to have "reason to believe" that the subject of a

warrant in actually in the residence.  In every instance, there has always been something more concrete, such as a car connected to the suspect located near the house, occupants in the house giving inconsistent information about the location of the suspect, information from confidential informants or others that put the suspect at the location, a known associate being at the house, or other evidence gained over longer periods of surveillance.  See *supra* (collecting cases).  Here, Eaton based his determination to enter the home forcibly on nothing but the day of the week, the time of day, and unidentifiable "movement" in a window.[6]  The time of day—9:00 a.m. on a Saturday—was not so early or late that a reliable assumption can be made that a person will be present.  While officers may reasonably assume that occupants are still asleep at 6:00 or 7:00 in the morning, the later the hour gets, the less likely the assumption is correct.  Can officers assume that a suspect will be in a house at 2:00 on a Saturday afternoon?  The presumption is meaningless if it applies to all twenty-four hours of the day.

Eaton argues that the presumption that Breana Clayton was home could only be rebutted by known evidence of the suspect's schedule, and since he performed no surveillance or any investigation whatsoever, he had a reasonable belief that she was inside the home.  Surely it cannot be the case that, the less investigation an

---

[6] Eaton also claims that he established that Bettie Clayton was Breana Clayton's grandmother, but the plaintiff disputes this, so the facts taken in the light most favorable to the plaintiff do not show that he established a familial connection.

officer does, the more reasonable his belief is. If so, complete ignorance is perfect reasonableness. The court finds it hard to accept the suggestion that an officer should be able to hide behind *inadequate* police work to claim immunity. The fact that Eaton failed to perform any type of investigation, which could have shown that Breana Clayton did not live at the house, does not insulate his actions. An officer may not choose to stay intentionally oblivious to the circumstances in order to ensure that he is protected in the event that his actions cross the line.

Additionally, the unidentified movement in the window cannot have been enough to give Eaton a reasonable belief that *Breana* was inside the house.[7] Dill admitted that he was unsure what the movement in the window had been. Additionally, Eaton never asked Bettie Clayton if anyone else was inside the home. For all Eaton knew, the movement had been caused by a draft from a ceiling fan or the family cat. Without more, these facts simply cannot give an officer the reasonable belief necessary to use a sledgehammer and a crowbar to enter the home of a third party to search for an arrest warrant suspect.

When this encounter is viewed in its entirety, with the facts construed in the light most favorable the plaintiff, it becomes clear that Eaton's actions simply cannot pass muster under the Fourth Amendment. Eaton went to an address that he

---

[7] Of course, it would not be unusual or surprising that other people might be in the house. But the constitutional reasonableness of the decision to enter the house turns on whether the officer has "reason to believe" that the *subject of the warrant* is actually present in the residence. United States v. Magluta, 44 F.3d 1530, 1533 (11th Cir. 1995)

obtained from a driver's license and a warrant. He had no idea where the police had obtained the address on the warrant, and he admitted that he "very often" served arrest warrants in instances where the subject lived at an address other than the one on the warrant. Eaton conducted no surveillance or investigation to verify the address was correct. He knocked on the door and asked Bettie Clayton if the suspect was there. She responded that Breana Clayton was not there and did not live there. Then, after being told about a nondescript movement in a window, Eaton used a crowbar and sledgehammer to rip open a door and searched the house room-by-room, ultimately to no avail. If this were allowed under the Fourth Amendment, the protections of the amendment would be meaningless.

### B. Whether the Right is Clearly Established

Having established that Detective Eaton's actions at the Clayton home on May 9, 2015, violated the Fourth Amendment, the question before the court is whether the Fourth Amendment right to be free of such a search was so clearly established that Eaton had fair notice that his actions were unlawful. See Holloman, 370 F.3d at 1264 (citing Wilson v. Layne, 526 U.S. 603, 609, 199 S. Ct. 1692, 1697, 143 L. Ed. 2d 818 (1999)). A right is clearly established when a case from the Supreme Court, the Eleventh Circuit, or the Alabama Supreme Court establishes that the defendant's conduct is unlawful. See Marsh v. Butler County, Ala., 268 F.3d 1014, 1032 n. 10 (11th Cir. 2001) (citing Jenkins by Hall v.

Talladega City Bd. of Educ., 115 F.3d 821, 826 n.4 (11th Cir. 1997). "Where the law is stated in broad propositions, 'a very high degree of prior factual particularity may be necessary.'" Fils v. City of Aventura, 647 F.3d 1272, 1291 (11th Cir. 2001). Additionally, a right may be clearly established where a law or constitutional provision so specifically forbids the defendant's conduct that it provided fair notice that the conduct was unlawful. United States v. Lanier, 520 U.S. 259, 117 S. Ct. 1219, 1227, 137 L. Ed. 2d 432 (1997) (discussing the "obvious clarity" standard). Therefore, even though Eaton violated R.R.'s Fourth Amendment rights as determined above, he still would be entitled to qualified immunity unless the law as established by a materially similar case or obviously applicable federal statute or constitutional provision provided him with notice that his actions were unlawful.

Plaintiff has argued that this case is an "obvious clarity" case. Obvious clarity cases are rare. See Fils v. City of Aventura, 647 F.3d 1272, 1291-2 (11th Cir. 2011). This narrow exception can apply only where an officer's conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the lack of fact-specific case law." Id. (citing Vinyard v. Wilson, 311 F.3d 1340, 1355 (11th Cir. 2002). Additionally, the decisional law may identify a general constitutional principal that applies with obvious clarity to a novel factual

situation.  <u>United States v. Lanier</u>, 520 U.S. 259, 271, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997).  In essence, when the officer's conduct is so outrageous that a reasonable officer would have known that he was violating the plaintiff's rights, qualified immunity is unavailable, even in the absence of a factually similar case. <u>Id.</u>

It is well established in the decisional law that a person's home is sacred, and must remain free of governmental intrusion except in limited circumstances where the search is reasonable.  <u>See e.g.</u>, <u>Kyllo v. U.S.</u>, 533 U.S. 27, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001) (citing <u>Silverman v. United States</u>, 365 U.S. 505, 511, 81 S. Ct. 679, 5 L. Ed. 2d 734 (1961) ("At the very core" of the Fourth Amendment "stands the right of a man to retreat into his home and there be free from unreasonable governmental intrusion.")); <u>see also</u> <u>United States v. U.S. District Court for Eastern Dist. Of Mich., Southern Division</u>, 407 U.S. 297, 313, 92 S. Ct. 2125, 32 L. Ed. 2d 752 (1972); <u>Payton v. New York</u>, 445 U.S. 573, 586-7 (1980).  Jurisprudence has established multiple times that a search inside a home without a warrant is presumptively unreasonable.  <u>See e.g.</u>, <u>Payton v. New York</u>, 445 U.S. 573, 586-7 (1980).  In <u>Steagald</u>, the Supreme Court made clear that under the Fourth Amendment an arrest warrant did not authorize an officer to search a third party's house for the subject of the arrest warrant absent a showing that the subject was in the house.  451 U.S. 204, 213-4.  Since Eaton did not have, and a

reasonable officer would not have had, a reasonable belief that Breana Clayton was inside the house at the time he broke the door to enter, the general constitutional principal articulated in <u>Steagald</u> applies with obvious clarity and states that the search was not permissible under the Fourth Amendment.

To a reasonable officer in Eaton's shoes, it would have been obvious that what he was doing violated the plaintiff's Fourth Amendment rights. With only an arrest warrant for a third party and no reasonable belief that the subject was inside, Eaton used a crowbar and sledgehammer to break into the plaintiff's home and search room-to-room once inside. These actions are so clearly contrary the protections provided by the Fourth Amendment that the officer should have known, and a reasonable officer would have known, that he was violating the plaintiff's constitutional rights. Therefore, Eaton is not entitled to qualified immunity. Accordingly, the motion for summary judgment is due to be denied.

## CONCLUSION

The Court finds that Eaton is not entitled to qualified immunity for his actions. Using a crowbar and a sledgehammer, Eaton broke through a steel door and made forcible entry into a home based *only* on (1) an address on a warrant, matching an address on a driver's license issued four years earlier, (2) the fact that it was 9:00 on a Saturday morning, and (3) a mysterious "movement" in a window. He was told by the homeowner that Breana did not reside there and that she was

not there at that time. Yet, he conducted no further surveillance or investigation to determine either that (1) the home was Breana Clayton's actual residence (it was not), or (2) that she was *actually* present at the time of his entry (she was not). He did not talk to neighbors, he did not check the registration of the lone car parked outside, and he did not determine that the homeowner was related to Breana. Although we will never know, it is unlikely that a detached and neutral magistrate would have found probable cause to issue a search warrant to enter the home on these facts. Even on the more forgiving standard of qualified immunity, taking the facts favorably to the non-movant, Eaton simply did not have a *reasonable* belief either that the home was Breana's residence or that she was actually there at the time of his entry.

The Fourth Amendment exists to protect all of us—the guilty and innocent alike—from unreasonable searches and seizures by the police. Police have the duty of executing arrest warrants, and qualified immunity protects them from reasonable but mistaken attempts to do so. At some point, however, the protections of the Fourth Amendment because meaningless if the police are not held to a proper level of reasonableness. On the facts viewed favorably to R.R., this entry and search was unreasonable. Accordingly, the motion for summary judgment is due to be denied.

A separate order will be entered.

DONE this 11th day of April, 2019.

_____
T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE